Good afternoon. We have one remaining case of the day. It comes to us in Appeal No. 25-2779 William Clyde Gibson III v. Ron Neal Wharton. Mr. Banks, nice to see you whenever you're ready. Thank you, Your Honors. Tyler Banks for the respondent, Wharton. May it please the Court. The District Court abused discretion by needlessly prolonging resolution of this case when it ordered respondents to transport Gibson for medical scans, the result of which Gibson has admitted will not and under Section 2254E cannot be used to prove his entitlement to habeas relief. Chute v. Twyford mandates that the issuance of such an order is reversible error. But even beyond the reasoning of Twyford, the evidence sought to be developed by Gibson is irrelevant to his bid for equitable tolling because he was represented by competent, capable, and active habeas counsel who did not abandon their representation. Those attorneys formulated a strategy to, quote, litigate procedural info for five years, and that is precisely what has occurred. That cannot be abandonment. That cannot even be called efficient performance. Given these facts, allowing Gibson out of prison to develop irrelevant evidence only serves to unnecessarily prolong the proper resolution of this case. Mr. Banks, the District Court ordered an evidentiary hearing in this case. Yes, Your Honor. Clearly, the District Court thought that there were some factual disputes that the District Court needed to resolve. I assume that – what is your understanding of the factual disputes that the District Court thought required an evidentiary hearing? So a couple of points on that. What do I think the District Court meant by that? Is this – Sure, sure. What's going to be contested at the hearing? We'll start there. I think because there is a confluence, I mean, there's five to six bases of equitable tolling, and I think that when it comes down to it, the parties will have a factual dispute, my guess, without throwing any evidence yet, about the petitioner's mental health during the limitations period. Do you think the abandonment issue is something that the District Court thinks is disputed and that requires an evidentiary hearing? I can say that for purposes of this argument, Your Honor, the evidence we're going to be relying upon today is primarily, if not completely, supplied by Gibson. When it comes to the facts surrounding counsel's abandonment – I think that's a fair rating of the District Court's order, Your Honor. I think that we have not disputed and we have primarily relied on facts that Gibson has supplied to make our case for the lack of abandonment and the lack of egregious attorney misconduct rising to what the 11th Circuit has called effective abandonment, that the facts as alleged don't even meet those thresholds. And that is one of the reasons why this case was needlessly prolonged, because former counsel's habeas strategy was not abandonment and it was not effective abandonment, because it was considered, based on research, involved cost-benefit calculus. In fact, two strategies were being formulated. We're drawing this from the declaration? I'm sorry, Your Honor. We're drawing this from the declaration? Yes, Your Honor. The first was two – there were two strategies. Mr. Banks, I guess I'm a little confused. As I understand it, the State has not appealed the District Court's ruling that evidentiary hearing is required or needed, right? We couldn't have appealed that. Okay. And so, as part of that, your understanding, as best you can tell, is that the District Court thought that one of the issues that necessitated an evidentiary hearing was this issue of abandonment. And yet you argue abandonment before us as though there are no factual disputes with regard to that issue and that we can rule as a matter of law as to whether or not there was abandonment here. But the District Court clearly thought there was, and you haven't challenged that determination, so I'm not sure how it is that you expect us to find here as a matter of law that abandonment did not occur, given this particular procedural posture. I guess, Your Honor, my response there is we are willing to accept the facts as provided by Gibson, as provided by Atavius Counsel, of their pronouncements of what their strategy was. And abandonment, it seems to me the District Court kind of, if I remember the District Court's order, and I apologize, I'll try to get as correct as I can, is that it kind of listed the different multiple grounds that were alleged to constitute equitable tolling and then just kind of generally said there are factual disputes in that. And so I don't believe, and please correct me if I'm wrong, Your Honor, that there was any particular thing about abandonment or about counsel's representation. It's just that there could exist on these various litany of factors some factual dispute. Our position is that when a petitioner is represented by counsel, that when we're looking at extraordinary circumstances, the only thing that constitutes extraordinary circumstances, when you are represented by counsel, is whether they abandon you or whether they engage in an egregious attorney misconduct arising to it. Mr. Banks, can I ask what I think is a flavor of the same question?  Okay. As I understand our appeal here this afternoon, the issue that is before us is not whether the District Court abused its discretion in ordering an evidentiary hearing or, for that matter, whether at the upcoming evidentiary hearing with respect to any argument or post-hearing briefing, whether Mr. Gibson is going to have a chance to prove abandonment. I know you might think he hasn't, that he doesn't have a good case of abandonment, but he's going to try his best on abandonment under Maples and Holland v. Florida and that whole rubric. The reason we're here seems much more narrow to me. It seems to me that the reason we're here is on the transportation order under the All Writs Act and how that evidentiary development, if it were to occur, would then play into the evidentiary hearing. Is that a fair construction in your view of where we're at anyway? It is, Your Honor. Okay, so I guess I'm with Judge Lee in trying to figure out, I hear you to be saying, and if you want to reset it, just reset it. I hear you to be talking about he doesn't have a meritorious claim on abandonment, that this was brought about, these requests for evidentiary development were about delay. But I don't think we're sitting in the courtroom today, the three of us, to decide abandonment. I just don't. Fair enough, Your Honor. I thought you brought a limited appeal. I did bring a limited appeal, Your Honor, or we did. I have a couple of responses. Yeah, go ahead. First, our position on every level of our opposition in support of our motion to dismiss in opposition to evidentiary developments, whether that be a hearing discovery or under the All Writs Act, is based on this theory. But I think that there is a narrow difference. What is the theory? I'm sorry. On this abandonment theory that under Maples, which Maples is a case in which counsel pulled out and didn't tell anybody. That's not what happened here. But I think there is a narrower ground, Your Honor. Because I agree, we are not here challenging, although we do challenge and did object to the grant of the evidentiary hearing or for equitable tolling. But I think the narrower ground, Your Honor, is under Shute v. Twyford. Shute v. Twyford held, and this is a quote, a transportation order that allows a prisoner to search for new evidence is not necessary or appropriate in aid of a federal habeas court's adjudication of a habeas corpus action when the prisoner has not shown that the desired evidence would be admissible in connection with a particular claim. Okay. So I think that, at least to my mind, that's the issue that we're here on. Okay. And my question for you on that is, does Mr. Gibson have to show that the neurological testing that he wishes to have happen at the hospital in Indianapolis? My understanding is it's two-pronged. It's an MRI and it's the so-called PET scan, right? There might be one additional one, Your Honor. But I thought one additional one might be able to be provided in the institution. I think you're right about that. I'm sorry. Okay. So the two tests that he wants to have done outside, okay, does he have to show that that testing could be used to inform an adjudication of the 2254 petition? So, for example, vis-à-vis like E2, or is his burden more limited to show that the results of the medical testing are pertinent to the equitable tolling analysis? Do you see the distinction? I do see the distinction, Your Honor. What is it, in your view, that his burden is? I think his burden is to tie the evidence sought to be developed to a merit – what I would call a merits claim within the 2254 petition. Okay. And what do you rely upon for that? And we're relying upon Schubert v. Twyford, and I recognize that that is in the context of procedural default and we are in the context of equitable tolling. I see no – both of those are procedural bars to merits review, and so I see no principle of reason why that logic would not apply in the equitable tolling context. And further, to the extent that there's an open question of whether that quote I just read you, whether the claim refers to a claim for procedural default or a claim for equitable tolling or an actually underlying habeas claim, I believe that it should be interpreted as going to an underlying habeas claim consistent with the goals behind it, especially in capital cases, and consistent with Supreme Court jurisprudence interpreting those statutes and the continued lines of holdings that say that the Supreme Court has – and I think Schin or Schin v. Ramirez and Schubert v. Twyford are excellent examples of this – of trying to reduce delay, and particularly in the context of in capital cases. In this case, we've already had six years of litigation of whether this petition can even be properly filed. That is not a delay that is intended to be allowed – I can't think of that word – allowed under EDPA, and that's not one that it wants to go forward. This – and I'll even – if I could go just a little bit further, Your Honor. The logic of Twyford I think is actually a little more powerful in the equitable tolling context. I'm sorry, Justice Breyer. I was going to ask, so you agree then if we're not contesting – Lowry v. United States. Okay. Sorry, I was pronouncing it – Hear it. It's not at play because you're not contesting the ability to have the evidentiary hearing. What I'm hearing is more nuanced than that, and that's the transport order went beyond what 2254E2 permits. That's our position, Your Honor. Unless you're able to tie it back to the underlying habeas request or petition.  Because that's the – and I think the reason for that – I hope this is a helpful dialogue. I think the reason for that is the reason – the way that you're up here legally is actually under the collateral order doctrine. Correct, Your Honor. Okay. And in the Twyford, the court viewed an all-writs act-based transportation order as reviewable, as a collateral order. But the collateral order doctrine – I mean, the Supreme Court, if they said nothing else about it, they said it is limited. So I don't think – I mean, I think we would be stepping way beyond that to say anything about the evidentiary hearing. The evidentiary hearing will go forward. And, Your Honor, you're right. We have a limited appeal here. And that appeal is about whether the propriety of what is essentially the exact same transport order that was being requested in Chute v. Twyford. And this court could have a limited holding issuing a reversal, and we can go back down and litigate some more. But we have provided further in our – actually, I'll rest it right here. The question is if there was evidence that would have supported the underlying. Or did the judge, in your contention, fail to make the analysis or do the work that Chute requires of explaining why the transport order was permissible? Yes. I think the latter, Your Honor. The district court did not engage with how Chute v. Twyford would apply in the equitable tolling context as opposed to the procedural default context. And, in fact, it seems that in the procedural default context, if we're going to talk about the equities here, Your Honor, is the evidence that would almost in all cases necessarily be used to excuse a procedural default under Martinez would be, in at least the Rule 403 sense, relevant to the underlying claim sought for the default to be excused. And so in that sense, applying Twyford in the procedural default context is, to the extent that there's an unfairness there, it would be more unfair in the procedural default context than it would be in the equitable tolling context. Why is that? Because very rarely in the equitable tolling context will the evidence to be developed be relevant to an underlying claim. And so what Twyford is essentially saying is evidence that you could use in two different stages has to be just thrown away if you can't use it for one of the underlying ones. But it seems strange to me that it would be equitable or even reasonable to say that evidence that would probably be thrown away anyway also can be developed when in that other situation it could not. Can I just pick up on where we're at here with just a continuation of this? Look, I can tell you right now, we're going to give you time. This is important to the state, and it's absolutely important to Mr. Gibson. Okay. So I want to push back on your answer that it has to be relevant under 2254E2. Okay. I know why you're saying that. But what's your best response to this? I'd like to say the real question before the district court at the evidentiary hearing that will happen is simply a question of whether Mr. Gibson has brought forth enough, whether under a theory of abandonment or something else, okay, to receive the benefits of equitable tolling to excuse the untimely 2254 filing. That's the reason we're here. There was a 2254 petition filed, and the state said it's untimely. So we have this whole argument come up about equitable tolling. So what is your response to the contention, which I think we'll hear from your adversary in a few minutes, that the evidence that's being sought pursuant to the transportation order really, for the immediate purposes, only has to be relevant to the litigation of the equitable tolling issue, not the 2254E2 considerations? We're just not quite there yet. I think I have to return to Sheepie twice. Yeah, go. Return to where you need to. I just want to hear the benefit of your answer. Because that was a suggestion near the end of that opinion, was that the petitioner in that case was saying this could also be used to excuse a procedural default, and the court said, well, we've already said this will not be admissible under E2 if you can't make the showing under E2. Therefore, it is pointless for it to be developed for just excusing a procedural bar, and I think there's a side to Shinbi Ramirez in there as well. With both Stan for the proposition that district courts generally are not, I mean, they did not abolish Martinez hearings because that wasn't truly the question before the court in Shinbi Ramirez, but certainly the message coming from the combination of those two holdings is that evidence to be developed purely to excuse procedural bars is not required or should not be granted. And if I could clarify a little bit, Your Honor, we, again, are only here on the order for respondent to allow or to be required to transport a serial killer or test under the All Writs Act. Nothing that this case represents prevents Mr. Gibson from developing further evidence in their own investigation. That's why the counsel didn't file the first petition timely, because they had more investigation to do, and nothing's precluding that. The only thing that we are objecting to on appeal is the requirement that we let, contrary to a jury's judgment in a sentencing and conviction order, to allow Mr. Gibson to leave a prison when Warden Neal's charge is to keep him there unless ordered by a court. Okay. There would be – I think you'd have to acknowledge this. I don't think this is before us. I think we can all pretty quickly agree on a circumstance where he may need to leave – someone in his situation may need to leave a prison for a mental evaluation. Suppose, for example, there's a Ford v. Wainwright claim. So if – I know that's not the situation that we're facing, but there is a long line of litigation under Ford that if someone awaiting execution is incompetent, not able to understand the punishment that's about to be imposed upon them, I think you've got to make the threshold showing. You could absolutely have them transported outside the facility for mental health testing. I think that's correct, Your Honor. It's got to be right. Yes, it's got to be. Provided that the threshold showing under Panetti was met, and then – I think that that would probably be the – Now, we don't have a Ford claim here, and I don't – I'd be surprised if they're arguing that this is about developing a Ford claim. A Ford claim is not ripe right now. Correct. And, in fact, there's not even an – there's never been an allegation that Gibson was incompetent during the limitations period to the extent that that would matter after Ryan being released. But, yes, I agree with you, Your Honor. I think that an All Writs Act transportation order would very likely not be an abuse of discretion to be issued under a Ford claim. Yeah, and, in fact, if there were real questions about competency of a defendant in that situation, the state may agree to it. That could be, Your Honor. I haven't seen – we have not run into that in Indiana yet, but – we've only had a few cases in the last couple of years. So let's look at the other side of that. When we were talking through shoots, and you – we mentioned 2254E2. My question is the other side is – and I know counsel will probably take – maybe take this a little bit further. 2254E2 comes into play if – and I'm reading from the statute where you directed us to, E2 – if the prisoner failed to develop the factual basis of a claim in state court proceedings. And so going to that equitable tolling question, that this is not a factual development to the underlying court proceeding or the habeas. This is not toward that. This is to a different question of equitable tolling that allows us to come from under 2254E2. And how would you respond? So that was a case that was made in Shin V. Ramirez of whether a claim referred to a claim to excuse a procedural default or an underlying habeas claim. In the opinion, the court said that it had good – that there are good reasons to doubt that claim refers to the excuse for the procedural default, but left that question open because there was a – because there was kind of a two-layered – a two-pronged attack that that argument was part of, and the court disposed with it on the second prong and not the one that Your Honor is asking about. I know. That's why I'm asking. Exactly, Your Honor. Well, I mean, I get this is said. It's an open question. I think that returning to – I think the court has clearly signaled that its interpretation of 2254 in many facets is intended to reduce delay and to narrow the methods to excuse procedural bars and equitable bars that the court has erected. That would be the interpretive point, I think, Your Honor. Beyond that, I think this is accurate. There's nothing in 2254A or really even the habeas statutes that discuss excuses procedural default to my knowledge. I hope I'm not wrong about this. To my knowledge, that doctrine existed before EDFA, so Congress could have spoken to that if they had wanted to and did not, and that might be another indication, although I haven't seen that in the case. I'll reserve my remaining time for a thought unless Your Honors have further questions. Okay. No, Mr. Banks, that's fine. Thank you, Your Honors. Okay. Let's hear from Mr. Gibson's counsel. Is it Loewy? It is. Nice to see you whenever you're ready. Thank you. Oliver Loewy for Mr. Gibson. May it please the court. So maybe we should just jump into E2 since that's where we've been.  And with regard to your question, Judge Pryor, and this is all brief, so I don't mean to just repeat, but the Supreme Court has held that the preliminary language in E2, that is, that there must be a failure to develop, does not apply. It's not satisfied, that is, there is no failure to develop where there has been diligence. It seems, then, that here, where the issue of equitable polling, and this may have been your point, did not even exist at the time of state court proceedings, that there could not have been a failure to develop. So E2 simply would apply. In addition, the warden is contending that unless the evidence gathered pursuant to the transport order serves a purpose, that is, serves, can be considered for merits determination purposes, then it can't serve any purpose. That is, let me try that again. The warden is asserting that Twyford must be read to hold that unless the evidence gathered pursuant to the transport order, the image in here, can be considered on the merits, it can never serve any purpose. Our position, of course, is that that's way too narrow a reading of Twyford, and this case kind of is an example of why. It does serve a purpose here. It serves the equitable polling purpose, as, if I've got the count right, all three judges on the panel have noted. I have a question about that. Yes. Well, okay, let me ask you this, to that point about relevance. So Ryan v. Gonzalez establishes that a prisoner need not be competent during a habeas proceedings, right? And so my question is, what is your response to the state's argument that given Ryan v. Gonzalez, which basically, in their view, takes competency off the table when it comes to post-conviction proceedings, why would the testing be at all relevant to equitable estoppel? Because the argument, at least the way the state has framed your argument, is that, you know, he should be granted the benefits of equitable tolling because testing would indicate that he was not sufficiently competent to assist the attorneys in pursuing their habeas claims. So let me speak back to you for a minute and make sure I've got the question right. The question is, if you've got an incompetent petitioner, equitable tolling would not apply. Well, no, that's not the first premise. The starting point of the question is that a prisoner, for the purposes of habeas corpus proceedings, need not be competent. Right. Right? That's Ryan v. Gonzalez. Right. So then why does any of this testing matter in this case for the purpose of equitable tolling? Oh, well, so it matters for a number of reasons. One reason, and as some members of this panel have already observed, there is this question of abandonment, which is a live question in the district court. So let me ask you this then. If we assume for the purpose of argument that he wasn't abandoned, that his counsel did not abandon him, okay? Let's just assume. Under that scenario, would you agree that these tests would not be relevant to equitable tolling? No, I would disagree with that. And one of the reasons is that Mr. Gibson was without counsel for over 100 days, and so his mental health becomes very relevant. Okay, well, I'm really going to change the hypothetical. So let's say that, in fact, he was represented adequately for the entire period. Okay. In that case, would you agree that testing, given Ryan v. Gonzalez, would not be relevant to equitable tolling at all? Yes, but there's a big proviso. There's a lot built in. It's very charged language that he was represented, I can't even remember the word you used at this point, but well, effectively. Effectively. If he were represented effectively, I think I would agree with you. Whether he was represented effectively is a big question, and in this case, it is a huge question. Because Mr. Gibson was, at the time, throughout the limitations period, was entirely off of psychiatric medication because the prison had withdrawn it entirely. And we have, in the declaration that Judge Pryor, you referenced, from former counsel, from one of former counsel, we have an explanation or an assertion that there were these various communications with Mr. Gibson. As if those communications can be viewed as you would view a communication from a person who was not suffering terrific, serious mental health issues. Our position, of course, is in order to know whether counsel was effective, not exactly the right term in this context, I know, but was effective, you have to know whether they were viewing the communications through that mental health lens. Because what they say in their declaration is, or what is in the declaration, and certainly what also the warden is asserting, is that these various communications from Mr. Gibson have a certain meaning. And the meaning has to be viewed through the mental health lens. The mental health lens here includes a psychiatrist's declaration about Mr. Gibson's attitudinal shift when he was taken off of the psychiatric medication. Is that the one from Dr. Watson? No. Dr. Watson is a neuropsychologist. The psychiatrist – I'm sorry, Judge, I'm just blanking. Dr. Watson is a neuropsychologist. The psychiatrist opines – Dr. Chambers? Thank you. Yes, Dr. Chambers. Based on his in-person assessment that Mr. Gibson suffers bipolar disorder, addictive disorders, and a history of significant traumatic brain injury. He further opines that those mental health difficulties coupled with the lack of appropriate psychiatric medication, or in this case, any psychiatric medication, left Mr. Gibson with a cognitive and motivational decline that significantly undermines his ability to manage his affairs. I think what you have to grapple with – and I've got a follow-up question. You've got to grapple then. I totally understand what you're saying. Okay. You've got to grapple with Gonzales. You've got to grapple with the Supreme Court saying what difference does his competency make? So what difference does his competency make? And I know you're going to say vis-à-vis equitable tolling, but you've got to grapple with that. So I'm trying. The premise to the Gonzales question was that counsel was well-representing the petitioner. Our contention is that the mental health of Mr. Gibson was not being – that former counsel may not have been – and again, we've not had a hearing. We don't know what's going to come out. But our contention certainly is that Mr. Gibson may well have – or the former counsel may well not have viewed Mr. Gibson's communications with them through the lens of the mental health decline. Let me try the question this way. Okay? Let me tell you what was wrong.  It's just not the argument that I see made anywhere. Okay, I thought what Mr. Gibson is doing in his legal papers, which I actually think are quite good since you've been involved in this, so compliments that. Thank you. But what he is doing is he's saying that his cognitive abilities during the relevant time period were limited or effective in a way that prevented him – and then this is the key point. He keeps saying the same thing. Prevented him from being unable to manage his legal affairs. That's the phrase that just is all over the place.  Okay. And so what I keep thinking to myself is, okay, now how does that bear upon equitable tolling? And is the theory the following, that had he been cognitively unimpaired in February of 2021, the relevant time period, okay, that he would have recognized – he would have had the cognitive facility to recognize that the decision to forego a 2254 petition made or recommended by his counsel at the time, Mr. Murray and Mr. Benza, okay, that that was so indefensible, that that was so incoherent, that that was so ill-advised, that that was so risky, on and on and on, that he would have had the mental facility to fire them, to go pro se, and to file a timely 2254 petition. Okay. I got to tell you, that's me trying to figure out what he means by unable to manage his legal affairs vis-a-vis the equitable tolling issue. That's my – that's what I'm trying to come up with. But that is not argued here. So what does he mean by unable to manage his legal affairs? So actually, it's unable to manage his legal affairs, recognize and care about his legal rights, and act upon them, is, I believe, the language that we've been using, and I believe the Seventh Circuit has used in a number of cases. The recognize and care about his legal rights portion of that goes to the psychiatrist's opinion that when he was taken off of the psychiatric medication, he had this decline and this attitudinal shift, such that he may have not cared or did not care about whether he lived and may affirmatively have wanted to die. Why? Because he wasn't on appropriate medication. There was no medication being provided to him. I guess, Mr. Lowery, what I hear from – kind of echoing what just Scudder said – what I hear from you is – and perhaps I'm just hearing incorrectly – is that if his counsel from the beginning had known he was incompetent, his counsel would not have been ineffective. And there would be no basis for equitable tolling, because under Ryan v. Gonzalez, his competence would not be relevant. And yet here, because his counsel at the time thought he was competent but didn't know it, and didn't know how to interpret what he was saying later, that somehow that constituted ineffectiveness of counsel. That's not what we're saying. What we're saying, Judge, what we're contending, is that counsel full well knew that Mr. Gibson was not on psychiatric medication and did nothing about it and should have been aware, given Mr. Gibson's history. But given Gonzalez, why would counsel have done anything? Because he would have no obligation to do anything, because under Gonzalez, it wouldn't matter whether Mr. Gibson was competent or not. Well, our argument is not whether Mr. – we're not contending that Mr. Gibson was not competent. Even counsel's understanding of whether Mr. Gibson was competent, under your theory, under Gonzalez would not be relevant because the competency of a prisoner during post-conviction proceedings is irrelevant to the merits of the claims. So two points. One is Gonzalez is about competency. We're not talking competency here. But I thought that's – okay, I'm sorry. I thought the purpose of the testing and whatnot was to determine kind of Mr. Gibson's mental capacity facilities during the time. Absolutely. But there's a wide range, of course, of mental states, one of which is incompetence. Here we're talking about a mental state which led – again, given the circumstances, Mr. Gibson was led by the lack of medication to have this critical attitudinal shift such that he didn't care whether he was going to die or not. So you might say, oh, well, counsel, you know, they were talking with Mr. Gibson, and he was down for everything that counsel was saying. Was he really? Or was that the lack of medication? And the expert psychiatrist from whom we've got the declaration before the court opines it's due to the medication. Here's what – go ahead. Finish your thought. So you mentioned, and now I'm not exactly remembering, the tie between E2 and merits. And in addition to the failure, you know, the failure word which we've already analyzed, so we don't think E2 applies because there wasn't a failure. In addition to that, without equitable polling, for which we contend the transport order is critical because it will not merely corroborate our neuropsychologist's opinion that there may be – that the testing that he performed indicates that it is likely that there is white matter dysfunction. It will not merely corroborate that. It will put that question to rest because the imaging will show as a matter of fact whether there is white matter dysfunction and the degree of white matter dysfunction, which ties back into the depression and cognitive decline. Because as Dr. Watson, the neuropsychologist, notes, the literature indicates that there is an intimate association between cognitive decline, depression, and white matter dysfunction. Okay, can I ask you a question on this? Yes, sure. To my eye, I don't see in the papers that have been filed the nexus that you just articulated between the PET scan and the MRI that you want to have happen at the Indianapolis Hospital. Okay. And the kind of mental side of the basis for the equitable polling motion. Let me put the point a different way. I don't see it.   Belin, believe me, I've looked for it. Okay. But what I do see is the following. You seem to have a pretty good record – and that's going to be for the district court to assess – that he was off, at least his OLAF, maybe more than that, during the relevant period, from 18 to 23. You also seem to have pretty clear declarations from Dr. Chambers, from Dr. Watson, and from others, that he was in a downward mental health spiral. Okay, my term, nobody – okay, at this point in time. And so what I've honestly wondered about is, so why is the MRI and the PET scan even necessary when the record doesn't really connect it very well to the theory that you're articulating? I just don't see that. And unless there's a really tight nexus, I think you've got a real challenge under SHUPE. So I get the whole point about white matter. I mean, there is no question. I can find, you can find, everybody can find discussions about, what is it, white matter deterioration or – Dysfunction, deterioration, problems. No question. There's no doubt about it. I mean, I can read it to you. Okay, but then you think, okay, now you've got to link that to equitable tolling, and you've got to link it in a way that the transportation order is justified here. And that's the part that I don't get. So the link to me, Your Honor, is between the declarations. If you read the brain imaging experts' declaration, brain imaging and neurobiology experts' declaration, and you read the psychiatrist's and, most importantly, the neuropsychologist's declaration, where he speaks of, the neuropsychologist speaks of, the association between white matter dysfunction and cognitive decline and depression, and you couple that with the neurobiology slash brain imaging experts' declaration about what that declaration can show, excuse me, about what that imaging can show, it seems to me readily apparent that the brain imaging will put to rest any question of the likelihood of white matter dysfunction. It will show that there is white matter dysfunction or that there isn't white matter dysfunction. And as my – Finish the training, though. Link it now to equitable tolling. And the reason it matters to equitable tolling, thank you, Judge, is that, again, Mr. Gibson was without counsel for over 100 days. And so the white matter dysfunction, assuming that it shows what we believe it will show, created, without question, this downward spiral, and therefore led him to not care about moving forward with his case. Okay, suppose he – I'm sorry to interrupt. And so, and so, thank you, and so, he would not have taken any action to file for that reason, whereas had he been – and again, that's aggravated by the lack of psychiatric medication. Had he been on psychiatric medication, even with the white matter dysfunction, which is – let me back that up a little bit. The white matter dysfunction creates these mental state difficulties. Those are only aggravated by the lack of psychiatric medication. Okay, let me hone you in on this, though. There's this theory, though, that what he would have done if he was not in the down-and-out memory is he would have affirmatively instructed Ken Murray and Michael Benza to file a 2254, or alternatively that he would have fired them for not filing a 2254 if that was the planned course of action, and that he would have timely filed a pro se 2254. Well, because I don't – he – where does it go? In other words – so with those first hundred days, it would have gone to him, those first hundred days of the limitation period when he was without appointed counsel. He – had he wanted to live, had these various – had the psychiatric medication been provided, and he had not gone down that spiral, yes, he would have been in a position then to file. We need to show that it in fact – that the mental health difficulties in fact had an effect on Mr. Gibson. So to go to your question – I was looking for this in the briefing, right, is this the Shoup problem that Judge Scudder is kind of pointing out is once this white matter dysfunction has been identified, we know there's a hundred days without counsel. We're still having to tie that back to being necessary, this new evidence necessary or appropriate in aid of the equitable tolling. And so that's why his question of – And so I think it is. I think it is in this way. The testing which is ordered under the transport order would allow Mr. Gibson to show that he suffered white matter dysfunction, which is associated, right, with the negative mental state, depression and cognitive deficits. And those would have led – those cognitive and – those attitudinal shifts, had they not existed, would have allowed Mr. Gibson to in fact prepare and file. Now that occurred. I'm sorry. And when counsel was appointed, would not have – assuming this comes out at the evidentiary hearing and it's credited – would not have led him to agree on, by the way, two days before the period ran, sure, let's not file because more investigation is needed, or for whatever reason. He wasn't – the lack of psychiatric medication and the effect of that, which would be further corroborated and proven, not just a question of white matter dysfunction, but the fact through the imaging. Yeah, see what's happening in the courtroom is a little – it's very valuable, but it seems disconnected to me from the record that was before the district court and the exact arguments that were presented to the district court. What you're saying now in the courtroom, in a very articulate way, okay, is that the white matter testing will bear heavily upon his cognitive ability, his mental health condition, okay, as of February 2021. Okay, the – that's when the limitations period expires. That's when the game is up there, okay. You're saying that very clearly in the courtroom. That nexus is very hard to see in the record to me, and as a result, it seems very difficult to connect the MRI and the PET scan to get to the necessary, very tight linkage that I think is compelled by SHUPE. It's very hard to see that. So, because we – Go ahead. So, we both are obviously very familiar with the record, so I just want to point you to the language which I think satisfies your concern from the lower court's orb on RSA 6 and 7. Where are you? What page? I'm sorry. RSA 6 and 7. So, the problem with – yeah, I mean, I'm thankful that you're pointing that out, okay, but whether there's abnormalities before February 2020, none of it's relevant. That's not relevant. So, I think based on the papers – And you're not trying to – I don't think you're trying to develop a forward claim right now. No, no, no. Based on – absolutely. But based on the papers below, it seems to me very clear that what the court was suggesting here is that the difficulties existed before, and because they exist today, he may be able to opine that they existed before 2020 and throughout the limitation period. Mr. Lowery? Stepping back for a second, I take it that your understanding of the evidentiary hearing is that one of the issues in dispute will be the issue of counsel abandonment. Absolutely. Yeah, I think this – I mean, I think the state agrees with that. I mean, they may argue it wasn't abandoned, and you'll have a – Well, it'll be abandonment, and it will be professional misconduct. I mean, something less than abandonment.  Yeah, I'm sorry, Judge. Yeah, I mean, you guys will – you'll have to – there'll be an adversarial proceeding in the form of the evidentiary hearing, and you'll make your respective arguments. Right. But we're trying to develop, of course, evidence to support our respective arguments. Well, on that front, I got to – I mean, you have a fair bit in the record here. And I heard you when you made this point before, Judge Scudder, and I'm sorry I'm interrupting you. Yeah, don't worry about that. Keep going. But you made the point before that we appear to have a fairly robust record on that, but we aren't limited to just a fairly robust record. No, I hear you. I mean, look, you're trying to do the best you can for him. In a world where there's a choice between what you have and can you get more, you're going to take more eight days a week. I get that. And I would think that the court would want more twos rather than an inference that there are these mental state difficulties. Well, you're not – I mean, you're not in it. I don't know why you'd call it an inference. I mean, you have sworn declarations. You have one from a professor. It's like Dr. Chambers. I mean, these are not – this is not somebody just off the street. I mean, he is talking in very specific terms – well, Mr. Gibson. He's talking about Mr. Gibson's mental state during the relevant period with a lot of particularity. Yes. So you're not going into this evidence you're hearing with unarmed. Right, but of course that's not the standard issue. No, I know that. So when you say, well, we want an MRI and we want PET scan. But you said a moment ago that you don't see where there's an inference. And the inference is in the neuropsychologist's declaration. He says that the test results shows that it is likely that Mr. Gibson has white matter dysfunction. That's an inference. From there to he does is an inference. And the imaging will show whether he does. It will also show the degree, something that the neuropsychologist's declaration doesn't address. Can we ask one more question? Yes, please. Okay, we'll hear it. Mr. Banks, don't worry. You're going to have time, as much time as you want. Okay. Mr. Banks made a point about some of the closing, one of the closing paragraphs in the Shoup opinion. But you've probably read 100 times by now. Okay. And that's the point where the court, after it goes through the 2254 analysis, if you will, the court responds to Mr. Twyford's argument that this evidence could plausibly bear upon excusing a procedural default. Okay. And the state quite understandably points to that and says, if that didn't get Mr. Twyford there, how is it going to work here? What's your response to that particular point? Well, what the Supreme Court says is unidentified claims, which were procedurally defaulted, didn't show us how this evidence would at all connect, would help excuse the procedural default. And then the court goes on to talk about a prior holding, right? It didn't need that for the decision. Our position is, if that's the language you're focused on, Joe, our position is that's dicta. And we filed the 28J letter. It's not necessary to the opinion. And this is where you rely upon that Fifth Circuit case. I'm sorry? Yeah, go ahead. It points to that Fifth Circuit case from 28J. Yeah, that's correct.  And that question remains open. Okay. Hearing nothing further, Mr. Laue, you have the thanks to the court. Thank you. Mr. Banks, back to you. Thank you, Your Honor. I just have a few quick points, one legal and one factual. On the legal point, it was pointed out multiple times that the claim here is that we need to do these MRIs to determine whether Gibson was unable to attend to his legal rights to manage or supervise litigation. And there was a claim that this court has held that that's necessary. This court has not held that. Importantly, the Supreme Court's never had that, but this court has never held that. But this court has said, starting in language that came from 2001, which I think in Johnson v. McCoffrey, that yes, petitioners do have a duty to vigilantly supervise their counsel. I have not seen that language in one of this court's opinions since 2013 when Gonzales was decided. And second, on the factual point, in the discussion, Judge Schuyler, is it seems to me that a lot of the responses of how this is relevant to the equitable tolling was, well, we need to prove the white matter dysfunction. What needs to be proved to the extent that Gibson's mental health was relevant during this period is his ability to function, his ability to do so. And as you've pointed out, Judge Scudder, there is tons in the record that says he was really depressed because respondents allegedly unprofessionally withdrew medication. But whether the petitioner's expert declaration about why these scans are necessary talk about etiology. They want to know the etiology of the symptoms they've already seen, which etiology means causes. Yeah, well, that's exactly what – I mean, that's the word. You're not just making that word up. I mean, that's the word in the declaration. I don't think it's necessary or appropriate in aid of the district court's jurisdiction to merely be able to put a name to the symptomology. Okay, but you've got to go further, though, okay? You've got to grapple with his argument, okay, where he's saying, look, there's a period of time during the limitations period where he's down and out, okay? And we would like to develop evidence on that front, okay, because this is, I think, in the period between when Joanna Green represented him and when Kenneth Murray came on board. You with me? I'm with you with the caveat, but yes. Okay, all right. So he's saying during that period, if he wasn't on this spin-out mentally, okay, that he may have had a completely different perspective and wanted to do everything possible to avoid being executed, including filing a 2254 petition, okay? But he wasn't in that mental state at all, okay? That's relevant to equitable tolling. And then the other point that I was making, it's not in the papers, but how do you respond to the point, maybe the theory is that had he not been in a spiral, that he would have said, this is the most ill-advised approach I've ever heard. You're fired. I'm filing my own 2254, and I'm filing it on time. That's what we're talking about here. So now you have to deal with that. First is the time period, this 100 days. It's just a larger view. Even if he were granted 100 days of equitable tolling, that would not shore up this petition. It's a practical matter. And the 100 days is a bit of a misnomer because the records show that Ken Murray was contacted in November of 2019, began researching the case, and there's indications of April of 2020. He was already starting the plan to equitable tolling. He told Joanna Green, and he told his team in e-mails that we're going to be documenting everything that we would have wanted to do. So while I think that 100 days comes from the formal end of, like, so when certiorari would have been denied from the Indiana Supreme Court's opinion post-conviction to Ken Murray's formal appointment, during that time there's evidence that counsel were actually working there, although they may not have been formally appointed. And I would have to relook at the records to see if there were any communications with Gibson during that time. And to your first point, you're saying the 100 extra days won't help because they filed it two years later. Correct. And I want to make sure I understand the second part of your question. No, the second part was simply my saying from trying to figure out what's the argument here about the mental health. It's me. It's not written down. I'm just asking you is how would you respond to a theory that if he was not in this mental health condition that he would have told Murray and Benza this is very ill-advised, you're fired, I, Mr. Gibson, am not going to run the risk of equitable tolling. That is very, very, very risky. Okay? And so I'm going to file a pro se 2254. 2254s are almost, you know it as well as anybody, they're hugely backward-looking. What happened at the trial, all that stuff. There's been tons of litigation here, and he would have said I am not running that risk of banking on equitable tolling. That's a high wire act legally. It's tough to try to speculate on that, Your Honor. It's tough to try to speculate on that, Your Honor, but I'm going to try. If the theory is that – Well, I'm not speculating. We're just trying to figure this out. Yeah. I guess the first thing that hits me is if Gibson were in such a state that he wanted to speed up the proceeding to be able to get to an execution date because he was so depressed that agreeing with counsel's strategy wasn't the way to do it. No, no, no. That's not the point. The point is this.  The point that Mr. Lowy is making is that he is down and out mentally. Right. Okay? Because he's totally down and out.  So I don't think – him saying that he agreed with Mr. Murray that he wanted to be executed, that's incoherent thinking. He's off the medication, all of that. Okay? And so what he's saying here is that his mental health challenges left him unable to understand his rights and act upon them. And what I'm wondering about is, is acting upon him firing Murray and Benza and prosaying the 2254 in a timely basis? Has that ever been argued? I'm relying on you to say that it hasn't. But I also think that I want to bring this conversation back to why we're here. Is even if that is the situation, whether or not that depression, that lack of cognition, that allegation was caused by a specific brain disorder, dysfunction, is irrelevant. Why irrelevant? It kind of goes back to the point I started with, Judge Pryor, is – and I see my time is up if I can answer your question – is merely knowing the cause. This is not the most apt analogy, but it's one I've thought of, is if we know a person is severely intoxicated, if we know that, what their actual BAC is is not necessarily the most relevant to whether they can function, whether they can drive a vehicle. It might be nice to know that he's .15 or .23, but when it comes to being able to walk the line or touch your nose or whatever the standardized field tests are, if we know he's severely intoxicated, that actual number doesn't matter. And it seems to me that this etiology question is trying to put a formal title on dysfunction, like behavioral dysfunction, that's already been alleged. I have a couple questions, but I'm going to narrow it down to one. I'm happy to answer as many as you have, Your Honor. Okay. Well, then I might give you both, if Judge Fetter is okay with that. We're fine. First of all, would you – assuming that counsel – that there was abandonment here of counsel, or a substandard, whatever that standard… Egregious attorney. Right, right. In that case, would Mr. Gibson's mental capacity be relevant to equitable tone? I think so. Okay. I think that that's what this circuit's case law holds, is that if mental illness in fact prevented the filing of a timely petition, now we might still… That's great, because, you know, one of the tips we always give counsel is concede when you have to, so that's good. But my second question is, given whether or not the district court would benefit from this additional evidence, it seems to me that's within the district court's discretion, no? And that's why district court asks for an evidentiary hearing, ergo that's not part of this appeal, right? Like, you're saying that district court doesn't need it to make these evidentiary findings, but the district court believes it does. And that to me is well within the district court's discretion to determine whether or how much evidence or what type of evidence district court thinks is probative of the issues in dispute. And so why would we touch that here? For a couple of reasons, Your Honor. I don't think the standard under the All Writs Act is simply whether the district court thinks it will help. I think what it brings to mind is this overlap in your arguments between whether you're focusing on whether it implicates district court's order of an evidentiary hearing or whether it implicates the court's transport order, right? And there's this kind of like overlap. And I'm wondering whether that issue skews more towards the district court's evidentiary ruling or ruling about evidentiary hearing versus the transport order. The issue of relevance. The issue of... Or of weight. Not really relevance, maybe of weight. Weight, to my mind, would go more to the evidentiary hearing point. But whether the district court... I kind of want to return to this point, Judge Lee, is whether there are a lot more considerations here when a federal district court is requiring or ordering a state official to engage in the conduct that's been engaged here. I think it's a little bit more than just as relevant. And those other... And the discretion has to be tempered by not only a recognition of that, but a recognition that EDPA's purpose is to reduce delay. That's fair. Thank you. Thank you, Your Honors. If the court has no further questions, we ask you to reverse. Okay. I'm not hearing any further questions. Mr. Banks, thanks to you. And Warden Neal, Mr. Lowy, thanks very much to you. We appreciate the advocacy. We will take this appeal under advisement. The court will be in recess.